## TULLY v. ROBERTSON.

District Court, D. Maryland. May 31, 1927.

### No. 1173.

Patents ⬿328—Applicant under applications Nos. 206,389 and 497,891 held entitled to allowance of certain claims rejected by Patent Office.

Certain claims of the Tully applications, Nos. 206,389 and 497,891, relating to the treatment of portions of the fabric used in making shirts, collars, and cuffs, with a water-resistant, adhesive stiffening material, *held* improperly rejected by the Patent Office.

In Equity. Suit by Francis W. Tully against Thomas E. Robertson, Commissioner of Patents. Decree for complainant.

Odin Roberts and A. V. Cushman, both of Boston, Mass., and Semmes, Bowen & Semmes, of Baltimore, Md., for plaintiff.

T. A. Hostetler, of Washington, D. C., for respondent.

SOPER, District Judge. The bill of complaint in this case is brought under section 4915 of the Revised Statutes of the United States (Comp. St. § 9460). The complainant prays to be adjudged entitled to claims 6, 7, and 9 of his application for patent, No. 206,389, filed in the United States Patent Office December 10, 1917, and also to claims 2 to 10, 18, and 19 of his application for patent, No. 497,891, filed September 2, 1921. All of these claims were rejected by the several tribunals of the Patent office, whose decision was affirmed on appeal by the Court of Ap-

peals of the District of Columbia. See 56 App. D. C. 274, 12 F.(2d) 624.

The first application relates to a process for the treatment of fabric of the usual material for shirts, shirt waists, and the like. Only such exposed parts of the garment as are liable to be soiled in use are subjected to the treatment. It consists in the application of a water-resistant, adhesive stiffening material, preferably a plastic cementitious solution of cellulose acetate. Drawings attached to the application illustrate the process as applied to the bosom of a man's shirt, as well as to collars and cuffs. The main object of the invention is to provide a class of apparel adapted to resist soiling and deformation of the surface by wetting, but still capable of being laundered. While the exposed portions of the garment are protected from wear and soiling, they nevertheless display the normal texture and color of the treated material.

The second application is merely a continuation of the first. It relates specifically to collars and cuffs, which may be attached to the garment by permanent sewing or by buttons or other fasteners, and its principal object is to provide collars and cuffs adapted to resist soiling and to be cleansed by ordinary washing without starching. It was probably filed as a separate application rather than as an amendment, in order to incorporate certain adaptations of the invention not disclosed in the specification of the first application.

Claims 6 and 7 of the first application, which were rejected, may be compared with claim 4, which was allowed. They are as follows:

"4. A textile fabric garment of the class adapted to be laundered, having only those parts exposed to rapid wear, soiling, rumpling, and the penetration of moisture in use protected by the impregnation of the interstitial spaces of the component yarns of said parts only with the residue of a solution of cellulose acetate left by evaporation of the solvent."

"6. A textile fabric garment of the class described having a multiply section stiffened by impregnation with a translucent waterproof cementitious plastic material causing the plies to adhere to each other.

"7. A garment of the class described having a multiply section, including face plies of cloth and a filling ply, saturated with a transparent waterproof cementitious material."

Claims 6 and 7 were first rejected, with all other claims of the application, on the patent to Closmann of 1907. His invention relates to the coating of starched and ironed goods, so as to form an impervious layer, whereby they may be washed without removing the starch or destroying the stiffness of the goods. He did not impregnate the article thoroughly, but coated it only with a solution of pyroxylin in amyl acetate. He thought that thereby the linen is not rendered unnaturally stiff, "as the coating does not produce such stiffness as is affected by other processes, where the pyroxylin is thoroughly impregnated with the linen." The Examiner noticed that the Tully application calls for, not merely a coating, but a thorough impregnation of the goods; but he said that the only distinction between the Tully process and the other processes referred to by Closmann is that Tully selects the collars and cuffs only of a garment for treatment, leaving other parts untreated, and he thought there was no invention in this step. The Examiners in Chief sustained the primary examiner, basing their opinion on the Closmann patent; but the Assistant Commissioner, on appeal, reversed the lower tribunals in this respect, saying:

"Claims 1, 2, 3, and 8 are rejected on a statement of the prior art in the Closmann patent. * * * Closmann lived in Germany, and the statement of the prior art may have been a statement of what was done in Germany, not what was done in the United States. The statement in the specification is too vague and indefinite to really disclose what was intended. There is no showing whether the prior art to which he refers began with starched or unstarched goods. All doubts certainly should be resolved in favor of the present applicant. These claims must therefore be allowed, with claim 4."

The Assistant Commissioner nevertheless affirmed the rejection of claims 6 and 7 upon the bare statement that they do not distinguish from the art cited against them. The Court of Appeals merely stated that claims 6 and 7 were rejected on the patent to Closmann. Neither tribunal attempted to explain why the Closmann patent is too vague to anticipate claims 1, 2, 3, 4, and 8, but is nevertheless sufficiently definite to invalidate claims 6 and 7. It has been suggested in argument that claims 6 and 7 are distinguishable from the granted claims, in that the former relate to a process in which the whole garment is impregnated, whilst in the latter a portion only is treated with the stiffening material. But the word "section," in claims 6 and 7, seems to be used as the equivalent of "portion," indicating that a part only of the garment is stiffened. Furthermore, it is con-

ceded by the pleadings in the case that the action of the Patent Office upon the granted claims was correct, and, with this concession in mind, no reason appears why claims 6 and 7 should not be allowed.

Claims 9 and 10 were added by Tully to his application to bring them into interference with claims 1 and 4, respectively, of the Huey patent of September 13, 1921. They are as follows:

"9. Web material having a permanent stiffness in portions thereof produced by treatment of the web subsequent to the formation of the latter, and having other portions thereof in a soft and pliable state adapted to facilitate folding." Claim 1 of Huey patent, 1,390,292.

"10. A fabric of uniform original texture, which has been made permanently stiff except at predetermined folding or cutting lines." Claim 4 of Huey patent, 1,390,292.

Claim 10 was granted by the Patent Office, but claim 9 was rejected and the decision of the Patent Office was affirmed by the Court of Appeals. Manifestly the two claims involve the same idea, and the inconsistency in the actions of the Office is so glaring that, since the institution of this suit, the Primary Examiner has granted a motion of Huey to dissolve the interference between his claim 4 and Tully's claim 10.

Claim 9 was rejected by the Assistant Commissioner on the ground that it contains new matter, shown in the Huey patent, but not in the earlier first application of Tully. Huey calls for a web material having a permanent stiffness in portions thereof, not destroyed by wetting, produced by treatment subsequent to the fabrication thereof, and having other portions in a soft and pliable state, adapted to facilitate folding, as well as to serve as hinges. The drawing accompanying the specification is said to be intended to illustrate merely one of various possible adaptations of the invention. It shows portions of the fabric to which artificial stiffness has been imparted by special treatment, and other portions soft and pliable; the latter being in the form of straight and parallel narrow bands alternating with the stiffened portions, which are in the forms of wide bands. The narrow bands are obviously adaptable to be used as lines of fold between the stiffened portions.

The Assistant Commissioner contrasted with this drawing certain figures of the first Tully application, which represent cuffs to be attached to a shirt, one of which is a single and the other a double cuff. The outer portion of the cuff, which encircles the hand or wrist of the wearer, is represented in each drawing as stiffened. At the other end, there is a margin untreated, so that it may be readily sewed to the sleeve, after the main body of the cuff has been treated. There is, however, no untreated line or zone in the middle of the double cuff to facilitate its folding, nor is there a specific disclosure in any part of the specification or drawing of the idea of an untreated narrow band between stiffened portions of the garment. Therefore the Assistant Commissioner, assuming that Huey's claims 1 and 4 (Tully's claims 9 and 10) should be interpreted as necessarily indicating the structure described in the Huey drawings, held that Tully was not entitled to the Huey claim. The Court of Appeals affirmed this action of the Patent Office.

The distinction made by the Patent Office between claims 9 and 10 arose from the fact that the Examiners in Chief granted claim 10, but rejected claim 9, on the ground that it calls for web material, not shown in Tully's specification. Since the expression "web material" indicates a textile fabric, the distinction does not commend itself to this court, and was not the basis upon which the Commissioner and the Court of Appeals placed their decisions. Each tribunal held that the specification did not justify the claim that a portion of the garment is left pliable to facilitate folding. Neither apparently observed that claim 10 contains the same idea.

A careful consideration of Tully's first application, in comparison with Huey's patent, leads to the conclusion that Tully is as much entitled to claim 9 as Huey. It will be observed that the claim is couched in rather general terms, and calls for permanent stiffness of certain portions of the garment, leaving other portions in a soft and pliable state to facilitate folding. The structure is not limited by the claim to a narrow margin or band of untreated material lying between the treated portions. The Huey drawing does depict such a structure, but merely as an illustration of one possible adaptation of the invention, as the specification explains. Tully does not show this particular adaptation, but he does disclose the idea of a garment partly treated and partly untreated, the untreated portion being used for sewing and folding, and he is therefore entitled to the broader language of the claim. The discussion of the Examiners in Chief in allowing Tully's claim 5 is pertinent at this point. Claim 5 is as follows:

"5. A garment section having a portion only thereof impregnated with a translucent waterproof cementitious material and dis-

playing the color and texture of the untreated cloth, said section having a portion untreated, whereby sewing in the untreated portion subsequent to treatment is facilitated."

In respect to this claim, the Examiners in Chief said that Huey's claim 4 covers the same novel idea, namely, the omission of the stiffening substance at predetermined portions to expedite folding or sewing. Again, in the discussion of Tully's second application, the Examiners said that Tully's specification and drawings of the cuffs, already referred to, disclose an edgelike termination of the stiffened portion, which leaves a marginal portion in the natural state to facilitate sewing, and that sewing involves folding. Untreated portions of the cuffs are left soft and pliable, so that they may be folded in and sewed to make an edge or to be attached to the sleeves. It is obvious, therefore, that Tully, although not disclosing a fold line intermediate treated portions of the garment, does show that a portion of the garment is left untreated for folding purposes. This, after all, is what claim 9 involves, and Tully is entitled to try it out in the interference proceeding with Huey.

Claims 2 to 10 of the second application were also rejected. Claims 2, 4, and 6, which are typical, are as follows:

"2. A collar or cuff of textile fabric having an area terminating at an edge adapted to constitute a line of fold and rendered stiffer than the remainder of the fabric by impregnation of the fabric of said area with a waterproof cementitious substance."

"4. A fold-over collar or cuff of textile fabric having therein a delimited area only resulting from uniform impregnation of the fabric with a resilient substance, said area ending at a boundary between impregnated and unimpregnated fabric, said boundary determining the position of the fold in the collar or cuff."

"6. A fold-over collar or cuff of textile fabric having a band portion and a top portion, the band portion being stiffened, waterproofed, and held smooth by interstitial impregnation of its component yarns with the residue of a locally applied waterproof substance; the portion of the collar or cuff adjacent the impregnated area and constituting the fold line being in its natural unimpregnated state."

The narrowness of the distinction upon which these claims were rejected may be more readily appreciated by setting out claims 1 and 11, which were granted. They are as follows:

"1. A collar and cuff of textile fabric having therein an area impregnated with a waterproof cementitious material and an area in its natural state, the boundary between said areas being at a predetermined place therein."

"11. The art of making textile fabric collars or cuffs comprising applying to and interstitially impregnating the component yarns of a predetermined area of the fabric only with a cementitious waterproof substance."

The objection to claims 2 to 10 is based upon the fact that they relate to the edgelike termination of the stiffened portion of the collar, which is adapted to constitute a line of fold. There is no question that the specification and drawings of the second application support the claims. The Patent Office, however, points out that the second application, although filed a short time before the grant of the Huey patent, was filed subsequent to the Huey application, and that therefore the Huey patent is a valid reference as to the common subject-matter disclosed by Huey and by Tully's second application, unless this common subject-matter is disclosed in Tully's first application which was filed long before Huey's. The Patent Office decided that Tully's first application does not indicate that the edge of the stiffened portion is to be used as a line of fold. Here again the drawings of the first application, which show a single and a double cuff, are important. Each cuff shows that the body of it consists of treated material with an adjacent untreated margin. Confessedly the margin is designed for sewing and the folding involved in turning in the plies and sewing them together to form an edge. But the Patent Office held that the actual fold does not coincide with the line between the treated and the untreated portions of the garment, but lies in the middle of the untreated margin.

The figures of the first application indicate a margin on the single cuff of something less than one-fourth the width of the cuff itself, and a margin on the double cuff of something less than one-eighth of the cuff's structure. It is apparent, therefore, that there is not a very great difference in location between a line of fold exactly at the edge of the stiffened portion and a line of fold in the center of the unstiffened portion. Yet it is supposed that such a distinction is shown in the Huey patent. An examination of the patent hardly substantiates the contention, Huey expressly states that when the finished cloth is cut up into required shapes and sizes, usually comprising adjacent stiff portions and an intermediate pliable portion, the folding

of a piece *within* the pliable portion will be facilitated. It is noticeable that the specifications and claims do not declare that the edge of the stiffened portion is to constitute the line of fold. Whilst the drawings indicate a fabric in which the treated portions are much wider than the untreated bands, it does not appear that the untreated bands are so narrow that the fold necessarily coincides with the edge-like termination of the stiffened portions. Of course a fold on the stiffened edge can easily be made with the Huey structure, but the same thing is true of the material shown in Tully's first application.

The Patent Office, in handling Tully's second application, has again failed to adhere consistently to the theory that Huey was the first to suggest soft portions of the material for the purpose of folding. Claims 20 and 21, added by Tully to provoke an interference with claims 5 and 6 respectively, of Van Heusen's patent, were allowed as follows:

"20. An article of wearing apparel made of separate layers or plies of fabric secured together, by an intermediate layer or layers of binding material, the said layer or layers of binding material being omitted along a narrow zone to form a portion of increased flexibility along which the article is adapted to fold." Claim 5, Van Heusen patent, 1,-479,565.

"21. A folding collar made of separate layers or plies of fabric, forming both the neckband and folding portions of the collar, said layers or plies being secured together by an intermediate layer or layers of binding materials except at the fold line of the collar." Claim 6, Van Heusen patent, 1,479,-565.

Thus Tully was held entitled in his second application to claim the idea denied him when embodied in claim 9 of his first application; although in the interval, Huey's application had been filed. Furthermore, Van Heusen's patent was granted January 1, 1924, on an application filed November 16, 1921, after the grant of the Huey patent on September 13, 1921. This ignoring by the Patent Office of Huey's supposed priority cannot be overlooked, since it occurred, not only when the Van Heusen patent was granted, but was reaffirmed when that patent was put into interference with Tully. Claims 2 to 10 of the second application of Tully should be granted.

Claims 18 and 19 of the second application were also rejected. They were copied from Van Heusen's patent, as follows:

"18. A folding or turn-down collar made in whole or in part of separate layers or plies of fabric secured together by an intermediate layer or layers of binding material, at least two of said layers being separate and unattached at the edge portions of the collar, and said unattached layers being turned in and secured to form the edge binding." Claim 3, Van Heusen patent, 1,479,565.

"19. A folding or turn-down collar having both its neckband portion and turn-down portion made of separate layers or plies of fabric secured together by an intermediate layer or layers of binding material, at least two of the layers or plies at the edges of the collar being separate and unattached, and the said layers being turned and secured to form the edge binding." Claim 4, Van Heusen patent, 1,479,565.

They may be compared with granted claims 11 and 12 of the first application, which were also copied from Van Heusen, as follows:

"11. An article of wearing apparel made in whole or in part of separate layers or plies of fabric secured together by an intermediate layer or layers of binding material, at least two layers or plies of fabric extending beyond the main united portion of the fabric, said layers being untreated with the binding material, and turned in and secured to form the edge binding." Claim 1 of Van Heusen patent, 1,479,565.

"12. An article of wearing apparel made in whole or in part of separate layers or plies of fabric, secured together by an intermediate layer or layers of binding material, the outer layers or plies of fabric extending beyond the inner layer or layers and forming a divided edge which is turned in and stitched to form the edge binding." Claim 2 of Van Heusen patent, 1,479,565.

The only difference on the face of the claims between 11 and 12, on one hand, and 18 and 19, on the other, lies in the fact that the former specify an article of wearing apparel generally, while the latter specify a folding or turn-down collar. To grant 18 and 19 in the second application, therefore, involves the fault of double patenting, unless, for some reason not superficially apparent, the two sets of claims may be given a different interpretation. The important element of the claims, for which they were introduced, is that which specifies two layers of fabric extending beyond the main united portion, separate and unattached, so as to be turned in and secured to form an edge binding. If this language is applied to an article of wearing apparel, such as a cuff, as in the first application, then it corresponds to the subject-matter of the specification, for it is

clear that the untreated margin of the cuff consists of at least two layers or plies which are unattached and are turned in and sewed together to form an edge binding. So interpreted, claims 11 and 12 are justified. It is not necessary to consider in this case whether this interpretation is justified, in view of the rule that the claims being taken from the Van Heusen patent should be given the meaning intended by the patentee. Drey v. Peiler, 53 App. D. C. 35, 287 F. 1012.

But with claims 18 and 19 of the second application the situation is different, for it is clear that Tully intends that they shall have a meaning not justified by his disclosure. Tully claims that two or more plies of the material at the edges of his collar are left separate and unattached, so that they may be turned in and sewed to secure an edge binding; but neither the terminology of the specification nor the drawings support the claim. There is shown, for instance, the drawing of a collar of which the entire band portion is treated and the entire top portion is untreated. Tully contends that the untreated top portion of the collar constitutes the edge binding consisting of turned in unattached plies; but certainly substantially one-half of a garment may not fairly be described as its edge. The portions of the collar which are treated are stiffened to the very edge, and the indication is that the inturned edges of the stiffened portion are secured together and stiffened in the same operation as the remainder of the plies.

On the other hand, the drawings and specification of the Van Heusen patent illustrate the true significance of the claims. The stiffening material is omitted from the narrow edge of the garment as to at least two layers, which extend beyond the main united portion and are turned in to secure the edge binding. Such a feature Tully does not show in any part of his second application. Claims 18 and 19 must be refused.